Before we begin on Motorola, we understand that there's two appellees, some significant issues, and so we've allotted 30 minutes to each side. We ask that you try to comply with that, and the appellees may divide it in any way that they wish. I mean the appellants. I'm sorry, I confused that. But you need to save some time for reply. Okay. Thank you, Your Honor. Good morning. My name is Michael Merrick. I represent Zurich American Insurance Company. And Mr. Jack Thomas is here representing Associated. We've agreed to split our time, Your Honor, as a 50-50. So we thank you for your gracious extension of time. We'll try to keep it succinct and to the point. This case is actually much more simple than it may appear from the papers. This is a straightforward case of contract interpretation involving a clear and unambiguous contract entered into between sophisticated parties assisted by highly capable counsel. The first and the insurers believe the only issue that this court should and needs to decide in its de novo review is whether the term environmental toxic tort claim, and more specifically the phrase exposure to toxic chemicals within the contract as a whole, reading the contract in all its clauses, as one and consistently precludes the cleanroom cases. It does. And I'd like to talk to you about why that is. Your Honors, for Motorola to prevail, it has to show two things, neither of which it can't. Number one, it has to show that Your Honors should and can write into the contract a requirement that the pollution or the contamination or the release, whatever the words may be, that only toxic chemical exposures taking place outdoors have been released. That's not the case. They can't show that. The words appear in no place within the release. They also need to write out of the release, the contract, the carve-outs for products and asbestos, because we know and it's acknowledged that those exposures can and do take place indoors. The court can do neither. It cannot write these terms into the contract, nor may it write the carve-outs out of the contract. And for that reason, the insurers are entitled to judgment as a matter of law. They were entitled to it on summary judgment, and they were entitled to it at the close of the evidence in the circuit court. Counsel, I have a question. The agreements indicate that the environmental toxic tort claims shall be included under CERCLA and RCRA. Do those statutes address the clean room litigation or clean room actions? Not specifically, Your Honor, but there is, and let me just respond by saying that the definition of environmental toxic tort claims is long. It goes on for almost a page, and it's divided up by various comments. What Your Honor is focusing on, I would respectfully suggest, is not really relevant to the interpretation that is necessary here. What is important is whether or not the clean room claims involve other injurious environmental conditions. And that's specifically defined within the release to mean including exposure to toxic chemicals. Okay, so from our perspective, so long as there has been exposure to toxic chemicals, which nobody denies, everybody admits that that's what the clean room cases allege, that that constitutes an other injurious environmental condition within the meaning of the release. Just to go back to my point, though, why would those statutes be referred to in the agreements? It was just clarifying, Your Honor, that that was one type of thing that would, in fact, be released. I mean, the release, let me back up, environment, if we look at that which is environmental, that's a broad term. This release includes on its face things that are both indoor and outdoors by way of exposure. We know by reason of the card acts that both indoors and outdoor exposures were contemplated. There is nothing in the release that confines its scope to those things that happen outdoors. There is a reference as one of the things that's released, surflow, rickrowth, that type of thing, but that's not exclusive. In fact, the broader terms, other injurious environmental conditions, including exposure to toxic chemicals, does pick up the clean room. So when lawyers draft agreements, they will throw lots of things in to make sure that it's clear about that which is included. But that is not, by any means, Your Honor, a limiting term. Now, one thing, let me suggest this, I happen to be very graphic, and I don't know if this helps at all, but in my preparation, because as I said, the definition is long and it goes almost to full page, I sort of broke things out with ellipses. I don't know if that's helpful to the court, just to see how this is a verbatim wording, but if it would be useful, I'd be glad to provide a copy. But when you break it out, when we really do the work that we need to do, it's clear that the release does encompass the clean room cases. Let me explain why. There's been a lot said here about whether or not the clean rooms are environmental. But if you look at the agreement, I'd ask you to look at it very carefully, injurious environmental conditions is defined, as I said, to include exposure to toxic chemicals. That's really all you need to find. And there's no dispute on this record that that's what the cases involve. But let's take a step back and let's look at what environmental means or doesn't mean for a moment. It's a broad term. It's an encompassing term. It encompasses indoor and outdoor exposures. A word can have a broad meaning but not be ambiguous. This is not an ambiguous word. For example, if we were speaking of the judges, Illinois state court judges, it could encompass your honors sitting in the appellate court, and it could encompass circuit court judges. Illinois state court judges is not thereby ambiguous because it picks up multiple subcategories. Fruit, for example. Because it includes apples, oranges, bananas, and pears and other varieties, does the word fruit therefore become ambiguous? Of course not. It has an accepted and defined meaning, and any word, I would suggest, can have multiple subparts. We could think of countless examples. The notion that environmental in the context of this release necessarily means only outdoors just isn't so. Let me take you to the Collins case. It's the Illinois Supreme Court case that was decided in 1997, and I think this helps make the point. Collins is a case that Motorola likes to cite and says, well, the court made this indoor-outdoor distinction, and therefore you ought to assume that same type of distinction here in the context of this case. Not so, and let me tell you why. We need to take a look at three different events in time. Let's go back to 1996. What happened in 1996? There was a study done by Motorola internally. It was a clean room safety program study where it hired four separate law firms, well-known firms that you would know, corporate firms from around the country, come in and study its potential liability as a result of these clean room cases which had been filed against another manufacturing company. It prepared a binder of materials, some 550 pages. It entitled it Clean Room Safety Program Notebook, in parentheses, Environmental. I repeat, Environmental. That was the title. We weren't able to get that in the court below. There was every objection interposed, relevancy, attorney-client privilege, and importantly, work product. So think about it. In 1996, when this compilation of materials was put together by Motorola, it anticipated litigation. It anticipated litigation over clean rooms, and that's why, in this case, they claimed work product protection. That's event number one. That's what happened in 1996. Can I interrupt for a second? Okay, so Motorola's interpretation of the word environment in the 1990s, it appears it was different than what they're arguing now. Correct. All right. So a way to look at the definition of environment based on Motorola's interpretation of the word back in the 90s or the way it's being interpreted in today's context? Well, certainly, their position today, Justice Reyes, is self-serving in the context of this. We say, number one, that the agreement is unambiguous, and I'll explain why I'm getting into columns in just a moment, why this is important. We say it's unambiguous and clear. Environmental is a broad term, and specifically, exposure to toxic chemicals applies here. Their arguments can be dismissed as after the fact. You would only get to this, we say, if, in fact, you accept the trial court's conclusion that the release is ambiguous. We say it's not. If it is ambiguous, we say probably the best evidence of all, much of what we couldn't get to, but the best evidence is how Motorola used the very term it's now disputing. It used this term. It used the label environmental to attach to clean room cases, and there's much more. But particularly from the perspective of Zurich, and I want to add there,  Zurich was presented with the settlement agreement. It accepted the terms of the release. There was no negotiation. So from our perspective, particularly with an integration clause, and we know what the Illinois Supreme Court has said about integration clauses and air safety. It evidences the party's intent to be bound by the terms of their agreement, not to get to extrinsic evidence. But I think the most significant piece, which we couldn't get into, which I think is grounds for reversal in and of itself, is what's in this binder of 550 pages. We do know the following. We do know that environmental lawyers put it together. We do know that they entitled it environmental, and we do know that they claim work product over it, which means that they anticipated litigation. They labeled this environmental, and years later they're saying, well, that's not so. But let me get back to the three events that I wanted to talk to you about. So we know that in 1996 they put together this binder. In 1997, the Collins case comes out. Now, Collins is a coverage case. It goes to the Supreme Court. There was an indoor exposure to carbon monoxide. We all agree, because it says it in the settlement agreement, that insurance coverage principles don't apply here. And, in fact, they said it in the trial court, but they've kind of flipped on appeal. They said in the trial court, well, we can't use coverage cases to make a point. Now they look at it a little bit differently. But Collins helps us, and let me tell you why. In Collins, the key language of a policy exclusion, which isn't what we have here, but a policy exclusion with all the presumptions that run against insurers because of that, was there was an exclusion for any discharge, dispersal, release, or escape of fumes and chemicals. Discharge, dispersal, release, or escape. What our Supreme Court said then was those are terms of art in the environmental context, and we're going to find that that does not mean an indoor exposure, that those are terms of art dealing with outdoor exposures. Now, in 2003, armed with the knowledge of what the clean room cases were and that they were environmental and they faced a significant risk of litigation, and then with what Collins said, they drafted a settlement agreement, presented to Zurich. And what did they say? Motorola included much broader language. The word chosen was exposure, that they precluded coverage, that coverage would be released for exposures. So if I take this cup here, and that contains harmful chemicals, can I breathe in the fumes? Has there been a discharge, dispersal, release, or escape within the meaning of Collins? Well, Collins would say no. Has there been exposure, if I smell, touch it, within the meaning of the release? Absolutely so. They chose different words. And Motorola had the roadmap of how to exclude even indoor exposure, but didn't do it. So the words have to be given in plain and ordinary meaning. The carve-outs, too, make imminently clear that indoor exposures are within the scope of the release. What would the purpose be to carve out cell phone cases specifically, which exposures can occur indoors and outdoors, if there wasn't an inclusion within the exposure to toxic chemicals and the like indoor exposures? There would be no reason for it. And it's the task of this court to give meaning to the entirety of the contract. And I suggest to you that you can't do it by Motorola's interpretation. You have to read in words which aren't there, and you have to read out the carve-outs which are there. Counsel, you and your co-appellant both say that the trial court erred by saying that the releases were ambiguous, but you can't even agree on what the error was in terms of the ambiguity. Associated says that the issue was that it was simply an error of law in terms of interpreting the release. But Zurich, on the other hand, says that the judge erred in denying the motion for summary judgment based on the Zurich release. Can you clarify that for me? Certainly, Your Honor. I think they are one and the same, but hopefully I can help. We were focusing on the procedural posture and simply saying that the court erred in denying the summary judgment. The release language is the same. What we're talking about here is substantively identical. Associated had the release that was then later presented to Zurich, and Zurich made no changes. But I can speak certainly for Zurich. I think we believe we're entitled to a reversal and a direction that judgment be entered in our favor or that this court outright enter judgment in our favor as is within its power. Did that answer your question? Yes, I guess. But where is the distinction between you and Associated? I don't think there is one. Maybe you can explore that with Mr. Thomas. But I think we are completely in sync on that issue, Your Honor. If you're splitting your time, I'm sure the appellant would like to step up, the other appellant. Thank you. Thank you, counsel. To answer your question, there's no difference. No difference? The releases are the same. The judge found the same ambiguity with respect to both releases. We both appealed the same issue. But Associated says it's error of law. Yeah, I'm sorry, it's error of law. In your briefs, you say that Zurich, well, you're Associated. And so you say that it's error of law, but Zurich, on the other hand, said that the judge, he erred by denying it based on the Zurich release, that that was his error. I think we're saying the same thing. As a matter of law, the releases, unambiguous, should be construed in favor of the insurers. I think we are saying the same thing in this case. I'm Jack Thomas, by the way. I represent Associated. The trial court saw an ambiguity in the contract. Conducted a trial to see if there was support for the notion. Counsel, identify yourself for the record, please. Jack Thomas. Thank you. To conduct a trial to see if there was support for the notion, the environmental toxic toward it defines it was, but somehow limited to indoor claims. But whether arguably ambiguous or not, the language of the agreement itself is the best evidence, the meaning of the agreement, and it's supplemented by two key pieces of information, evidence, which I'll get to. As we demonstrated in our briefs, in deciding against the insurers in the trial, the court lost sight of the issue and decided on a theory that was mistaken and not based on evidence. I'll discuss the evidence first and how the court lost its way. The fact that the court was able to find an ambiguity or thought upon an ambiguity does not mean the theory became irrelevant. As Justice Hall wrote in the Liberty Mutual case in 2005, the best evidence of the party's intention is the agreed upon language of the contract. And here, that evidence is, one, a broadly worded release of other injurious environmental conditions tied to exposure, not dispersal or release, to all forms of toxic substances. That would be just like the claimant claims. There is absolutely total absence of any words whatsoever limiting environmental only to outdoor claims caused by a release, which is what Nodal is attempting, probably, to write into this agreement. Third is the fact that the release extends to claims whether foreseen or unforeseen, suspected or anticipated, whether known, unknown, or unknowable. That means that the claim was not discussed, was not known, was neither imagined nor estimated. These lawyers negotiated a release that applies to all claims that fit the basic definition. And fourth is the agreement as a whole. The broad definition has two negotiated carve-outs, one of which is for asbestos claims, which are toxic towards the horizon, indoor, working environments. Can we look at some other parts of the agreement? There are some recitals that seem to indicate that the party sat down at a table to negotiate a specific type of claims that dealt with the same type of things that were going on in the Valley litigation, not only the Valley litigation but the coverage issues there. Are we supposed to ignore that setting? No, there's no dispute that that was part of what prompted the discussions. From my client's perspective, my client wanted a buyout, and they approached actually Monroe about that. And they had discussions about a buyout. They didn't want a buyout. So there was some back and forth. A buyout of the whole policy. The whole thing. Complete buyout. We pay you money and you walk away with no further obligations. They wanted something less, and that was related to the Valley cases. And there was lead up to the last meeting between the parties about what they wanted, and at that meeting there was some negotiation. And what happened at the meeting is they agreed to what they agreed to, and that's the document we're talking about. So the recitals are nice. They reflect the fact that there was some litigation between the parties and what that litigation related to, but it didn't define what was released in any way. What was defined in the release appeared for the very first time in the release and never before. And it's not tied in any way to the Valley litigation. If indoor environmental toxic torts were not part of the release, there would have been no reason to carve them out, which brings me to the last two pieces of evidence. The first is the judge actually found them to be carve-outs, and Motorola themselves called them that. If they were carve-outs, they must have been carved out from a definition that otherwise reached indoor toxic torts. And second, you have the fact that Motorola themselves, without hesitation, in internal documents referred to clean rooms as environments and clean room claims as environmental. Now, for the court's decision, the court had set a trial to answer this question, the intended meaning of an environmental toxic tort. But the court lost its way. After finding the contract ambiguous, the court acted as if the words of the contract became irrelevant. It never went back to them. But that's wrong because the words of the contract remain the best evidence. So instead, the court reasoned that because the parties had not discussed clean room claims specifically, and because the parties did not obtain a full policy buyback, which the court repeats multiple times, there was, the court held, no agreement or contemplation by the parties to include the clean room cases in the scope of the release. Our job here now is to look at the evidence and determine whether or not the conclusion, the ultimate conclusion of the trial judge, is supported by the manifest way to the evidence. Assuming, of course, that we find that he was correct in finding an ambiguity. So can you talk to us about the evidence and how the manifest way to the evidence may not support or does not support the conclusion? That's exactly where I'm going. Great. Sorry to interrupt. Well, it's fine. If I can preface it with the legal conclusion he reached, because the evidence supports that. So the conclusion he just reached, as a legal matter, is of no consequence because this court has held explicitly that when the terms of release apply to a category of claims, a particular claim need not have been specifically contemplated to be released. So it's of no significance that the parties didn't discuss clean room claims. Okay, so let's just go to, the bottom line is, he found that the settlement agreement did not cover the clean room claims. Right. Based on the proposition that he didn't discuss or contemplate. Okay, let's put that aside. We need to look at whether or not the manifest way to the evidence supports the ultimate finding or declaration. Tell us how that doesn't work. So, the court prefaced the finding, incorrect legal conclusion, which is a de novo review by you, on two predicate facts. I mean, there's a whole trial record, but the judge focused on two predicate facts. Okay, I want you to concentrate on the record as a whole and tell us why the manifest way to the evidence doesn't support that the clean room claims do not fall within the settlement agreement. Well, I'm confined to an extent by what the court focused on. The court reached a conclusion based on two facts. There's nothing in the opinion to suggest that he considered any of the other evidence. I mean, he says he did in the broad statement, but if that were all that was required to insulate a decision from appeal, we'd never have a chance to come up and view for this court. So the fact of the matter is, is the two facts he focused on, one was that he said that all parties were aware that IBM had been the subject of clean room claims, and then he found that no party discussed or negotiated the question whether the clean room claims would or would not be included. The court then in error inferred that the insurers, because of the IBM claims, had sufficient knowledge of Motorola's potential for clean room claims to raise the subject. But that was purely in error because there was zero evidence that either insurer had any reason whatsoever to believe that they had concerns about clean rooms. More fundamentally, there was absolutely no evidence that either insurer even knew that they had clean rooms. So because that finding was not supported by anything in the record, it was in error. And the second part is that the court also held that each party saw a complete policy buyback, and spoke to this fact very heavily in his conclusion. He took that finding coupled with the one I just talked about and held as follows. Had it been the intention of the parties to forever terminate either defendant's obligations under specific policies, which would be a buyback, either could have simply and directly stated in the release a clear, definite provision listing each policy issued in favor of the plaintiff and the fact of termination thereof upon execution. That, glaring omission the court held, supports an inference that there was no agreement or contemplation by the parties to include clean room places in either release. But the court was simply in error. Yes, the insurers had sought a buyback in negotiations, but that's not what we contend the release accomplished. We didn't argue that in summary judgment. We didn't argue it in trial. And I'm not arguing it today. The issue today is the same as it was before. The release provides a full release, subject to two carve-outs of environmental toxic torts. So to the extent to which the court focused its premises decision on this buyback notion, it was simply in error because the two issues have nothing to do with one another. The last thing the court referred to was Motorola being unwilling, supposedly, to release claims it could not price or estimate. But the bottom line is here is they released all claims. They didn't know about all future claims, notwithstanding they couldn't estimate them. It was the covered claims that they carved out. Those are the ones they carved out. So any argument that they categorically refused to release any and all claims they couldn't anticipate or price is belied by the record. So to get to your point, there was a lot of evidence. There was evidence of discussions that led up to a meeting. And at a meeting there were negotiations that took place. And what flows from the meeting is the agreement. That agreement, which is the best evidence, is what the manifest discussion really needs to focus on. Because that's what the parties agreed to. So if you strip the flawed reasoning from the court's decision, you go back to whether the release as written encompasses the premium claims. And the answer to that is yes. Because the script of the release of environmental and toxic torts is vast and without any words limiting environmental only to outdoor claims caused by release. The carve-outs prove that the release contemplated indoor environmental claims. Asbestos claims are quintessential indoor workplace environmental claims. The dictionary, as well as OSHA, which is a statute which implicitly is referenced in the release, supported broad reading of the word environmental. And their own corporate documents define cleanrooms as environments, as part of the evidence, and cleanroom claims as environmental. Aren't we supposed to be looking at the circumstances surrounding the agreement? Absolutely. I'll go back to this. There were a series of discussions. The parties wanted different things. That's not in dispute. But I respectfully say it's almost irrelevant to what they agreed to. Because they agreed to what they agreed to. There's no doubt that before they reached an agreement, they wanted different things. They wanted a more narrow release. We wanted a buyback. We didn't get a buyback, and they didn't get the narrow release they wanted. They didn't get the thing that they circulated on March 17th, which was a release of valley claims and similar claims. That's what their draft on the 17th said. That's not what the release says. The release refers to prior litigation, but it's not incorporated in and not part of the release. The release language of environmental and toxic tort stands on its own. That 300-word definition with two carve-outs is what governs the party's agreement. The fact that they had negotiations, which is nice. They're sophisticated parties. They should negotiate. Is background noise. Good evening.  Thank you. Thank you, Counselor. Good morning, Your Honors. Good morning. Pete Lawn with Jones Day. I have with me my partner, Jim White, here in Chicago. We're happy to represent Motorola in this matter, and we appreciate the Court here in oral argument on this. There are ample grounds on which this Court can and should affirm the trial court's judgment, both in terms of its denial of summary judgment to the insurers and its decision in favor of Motorola following a bench trial. Mr. Merrick started off by saying that Motorola has to prove two things, that the cleanroom claims are outdoor claims and that they fall outside the carve-outs. I would respectfully submit that that's entirely wrong. Motorola doesn't have to prove anything here. The burden of proof to prove the release applied to the claims was and always has been upon the insurers. They are the party asserting the benefit of the release. They bear that burden at all times. I'd like to focus, subject, of course, to what the Court would like me to focus on, on three basic points. The first is that the insurers were not entitled to summary judgment, that the release barred coverage for the claims. Why is that? Admittedly, it's a very long release. Lawyers use lots of words to say things. Sometimes fewer words might be better, but the bottom line is it is a very long definition. But the core point is, what is actually being released? And it says it quite plainly. Motorola released claims involving environmental pollution, environmental contamination, and other injurious environmental conditions. Environmental, in this context, plainly is a word of limitation. If it were intended to mean anything, anywhere, or something incredibly broad, why include it at all? The parties could have simply said other injurious conditions or all toxic torts or something like that. They didn't. They chose specific words. One of the words they chose was environmental. Judge Pierce found on summary judgment, and ultimately after trial, that the insurers had not carried their burden to prove the release applied. Turning to the trial, it's not a surprise that the insurers don't talk much and don't want to hear much about the trial. Because the evidence at trial is very one-sided. It proved that there was a specific negotiation history as to what the term used in the release, environmental slash toxic torts, meant. And what it meant was what it had always meant. For years, it meant the valley claims and claims like the valley claims. That becomes very clear from the context of the agreement, from the whereas clauses all the way through to the end. If that was the intent, wouldn't it have been a lot simpler to set that definition out in the agreements than what was agreed to between Zurich and Associated? I submit, Your Honor, that it is set out. Because in the agreement, one of the first things that comes up in the whereas clauses is a description of the underlying litigation that led to settlement, the valley litigation. Right. The valley litigation is described as known environmental slash toxic tort claims. It follows logically that unknown, that which was actually released, unknown environmental slash toxic tort claims are of the same ilk as known environmental toxic tort claims. So when you get to the definition, to the extent the definition is unclear and needs some interpretation, you can look back to the whereas clauses for context. And if known environmental slash toxic tort claims or the valley claims and claims like the valley claims, it seems self-evident that when you start talking about releasing unknown environmental slash toxic tort claims, that it's of the same type. So you're just referring to the known sites at that time in the agreements, right? The history of the negotiation is that there were, the valley claims, there were 56 sites of which Motorola had given notice. And 56 sites that had environmental claims of one sort, CERCLA, RCRA, agency actions, State of Illinois, agency complaints or actions of one sort or another. Motorola had given notice of all of these. And so when it came down to negotiating, associated, as Mr. Thomas correctly said, wanted a broad release, Motorola was willing to release environmental claims. And the record makes that crystal clear. But it was not willing to release anything other than environmental claims. Now, environmental claims clearly included toxic tort claims associated with environmental issues, just like the valley claims. And it's perhaps worth going back to the genesis of this release to understand what the valley claims were. The valley claims involved allegations that Motorola had polluted groundwater. A plant in Arizona had released toxins, chemicals, into the soil. The toxins went down to the groundwater, and the groundwater ultimately was used in, was pulled up through wells and used in people's homes for drinking water. The allegation was that Motorola injured neighbors of the plant when they ingested or otherwise were exposed to the groundwater through showers and the like. So that sets the stage. What were the claims that were involved in the valley litigation? They were environmental claims. They were claims that involved some preceding release of the environment by Motorola, followed by whatever happened next, claims by government agencies, claims by private plaintiffs, and claims by state agencies. So that sets the stage for what was being discussed and released. The cleanroom claims. The cleanroom claims, as the court knows, involved an allegation that employees inside Motorola facilities who worked in cleanrooms were exposed to toxic chemicals. It's a wafer or chip manufacturing facility out in Arizona. And in the process of manufacturing chips, they try to isolate the room where the chips are manufactured because the process is so fine from the rest of the outside world. And so there are these cleanrooms which have filtration and other units which isolate that room from the rest of the facility. The workers claimed that while working in that room, they were exposed to toxins in the course of their everyday work life. They don't claim that Motorola exposed them through showers or drinking water, it was just right in that cleanroom. And so I would submit the cleanroom cases are the antithesis of the valid cases. In the valid cases, you have clearly an environmental release and environmental claims and then some other means of exposure. The cleanroom cases involve exposure with no preceding environmental release. Both appellants spend a fair amount of time on an indoor versus outdoor distinction. I would submit to the court that that's, in fact, a straw man. The issue isn't whether it's indoor or outdoor. The issue is really whether there's a preceding environmental release. The release uses environmental in all three places, environmental pollution, environmental contamination, and other injurious environmental conditions. So for anything to be excluded, that's right in the middle of the definition, anything to be excluded, there has to be some sort of environmental claim, and there is none here. So basically you're saying there is still some type of outdoor-indoor distinction in how you define environmental, correct? In the sense that environmental claims, I suppose, typically would involve some sort of outdoor release, but that's not even strictly speaking true. For example, one of the allegations in the cleanroom, in the valid allegation, was that solvents seeped out of the floor of the Motorola plants and directly through the soil into the groundwater. So it's straight down through the floor and cracks in the pipe. So is that outdoor? I don't really know. But what it isn't is an exposure in a room that's isolated from the rest of the plant. And again, I think the context for what the parties were trying to sell is provided by the words of the agreement itself. I think it's worth... There are a few principles of Illinois law that really haven't been touched on. The first is that releases are strictly construed against the party concerning their benefit, and that party bears the burden to prove them. Why is that important here? This is not a contra-proferentum case. Motorola has never argued contra-prof. So all of the discussion about what Judge Pierce may or may not have done in terms of construing the release is utterly beside the point. Motorola never argued for contra-prof, which is simply that the person who drafts it has it held against them. We argued it under Illinois law, and there's a long, long line of Supreme Court and appellate court cases that say this. Releases are construed against the party asserting their benefit. The issue of contra-prof was just simply... It's another windmill to tilt at. Judge Pierce says right in his summary judgment opinion, and he says it again in his trial opinion, that he didn't construe the release against anyone for any reason. He construed it, and he found it ambiguous. I'd like to turn to what happened in the settlement negotiations, unless the court has further questions about summary judgment. And you're offering that in the context of Manifest Way. Yes, I absolutely am. I will submit this. We had a week-long trial in front of Judge Pierce. He heard a number of witnesses. He assessed their credibility. He saw the documents, and he decided that the insurers hadn't proved their case. There are good reasons for that. The negotiations went as follows. In early 2002, there were preliminary discussions  The scope of the release that was in discussion between Zurich and Motorola at that time was very simple. And both sides described it exactly the same way. It was an environmental release. That is the words that Zurich used, or its counsel, and that is the words that Motorola and its counsel used. So there's this initial flurry with Zurich, which unfortunately goes nowhere. What was the bidding? Motorola had paid about $40 million in settlements and judgments and environmental remedies at the various sites involved in the Valley litigation. Zurich, on its part, had spent $57 million defending the Valley litigation. Zurich asserted a recoupment claim. So Zurich essentially said, we get to get our defense costs back if we prove a coverage defense. Motorola said, no, you Zurich have to bear all of those expenses, plus you have to reimburse us for the indemnity costs, or settlement and judgment costs. The parties started roughly $100 million apart. There was an early mediation in 2002. It went nowhere. The parties moved a little bit toward the center on dollars, but there really was no discussion of the release because the release was the same. I mean, it was pushing against air because it was an environmental release. With an unsuccessful mediation with Zurich in the taillights, Motorola then moved on to Associated. Associated had less coverage. It had two primary policies versus Zurich's 20 or so. It has big excess policies, a couple of $10 million in larger excess policies. But in the ultimate scheme of things, it was a smaller player. So Motorola then turned to Associated. No question that Associated wanted a broad release. I mean, so would I if I were insurer. I mean, I guess I'd like to be 6'3 and have a full head of hair. But wanting things doesn't make them happen. And in that case, Motorola was not clear, was not willing to agree to a release of that type. So what happened next? The parties went back and forth. There was lots of correspondence back and forth between them, and it's laid out in Motorola's brief and, of course, in the record. Motorola, Associated pushed for the broadest release it could get. It wanted a buyout. Motorola said no. It wanted something, it wanted as broad a release as it could get. Motorola said no. What Motorola said it would do was an environmental release. And that term is used throughout the correspondence between the parties. There are lots of exhibits that go back and forth, lots of correspondence that goes back and forth. They were all exhibits at trial that were laid out in our brief in gory detail. But I'd like to direct the Court's attention to one in particular. And this is an October 2002 settlement presentation made by Associated to Motorola. And it's in our brief on pages 17 and 18. It's in the record at 22.00036. This is Associated's settlement presentation. They do a detailed settlement presentation telling Motorola what they'd like to settle and describing the claims that had been submitted. And they use a dichotomy to refer to two distinct types of claims in that settlement presentation. One of them is they describe environmental toxic torque claims, environmental slash toxic torque claims. The exact same term that ended up in the settlement agreement. What do they use that term to describe? The value litigation. In their own presentation it says, under the heading environmental slash toxic torque claims, it talks about the value litigation. It doesn't talk about all these other toxic torque claims. It talks about the value litigation, which unquestionably had a preceding environmental release. A later section of their presentation talks about what Associated itself describes as non-environmental claims. And what do they say there? Asbestos and cell phone claims. So they know those aren't environmental claims. That document is critical because the term environmental slash toxic torque, which finds its way all the way through the correspondence from 2002 into the actual settlement agreement in 2003 is the same term. It had been used by the parties for months and months, for more than a year. And so when it shows up in the settlement agreement, it didn't spring from nowhere. There's a long history that goes with it. And that history is that that phrase means the valley claims and claims like the valley claims. That's what it came from. So then what you're saying is that the way Motorola defined environmental in the 90s is relevant? No, what I'm saying is that where the term environmental slash toxic torque, everybody knew what that meant. And so when you get to a settlement agreement and you say Motorola releases environmental slash toxic torque claims, all the words that follow are just trying to hang lawyer words on it. You're talking about the settlement. Yes, the settlement. But during the settlement, wasn't there also discussions about environmental and non-environmental and certain claims were given certain designations as to environmental? Should we be looking at that? I think how some party used it. These were the lawyers that were negotiating the settlement agreement. They were not, actually. I'm not sure if Your Honor is referring to the Crisp Notebook. Yes. So the Crisp Notebook was drafted in 1996, years and years and years before the settlement negotiations and more than a decade before the cleanroom claims. And the evidence, because it was privileged, Motorola didn't produce it. What they're referring to is there's a label on the Crisp Notebook that says, and this was submitted in camera to Judge Pierce, there's a label on the notebook which was put on by a paralegal which says, Motorola cleanroom, quote, you know, for an environmental close grant, which is what counsel for the appellants referred to. They never saw this note, right? Illinois focuses on one thing in determining how releases are construed when you get into its extrinsic evidence, right? What is it? It is what the parties say to each other. It's not what Motorola thinks. It's not what Zurich thinks. It's what the parties communicate. And the way Illinois courts have referred to that is the objective manifestation of intent. And that is the communications that cross the line, that go from one party to another. What crossed the line here? The only thing that ever crossed the line was all this description of environmental slash toxic tort and what it meant. Everybody knew what that meant. So that's what crossed the line. So what, you know, what Motorola thought or what some paralegal might have written on a notebook has no more to do with construing a release than what Zurich's counsel thought. There's a lot of evidence that Zurich tried to put on a trial about what its lawyer, Mr. Pearson, supposedly thought when he got this release. Well, you know, Mr. Pearson never said a word. He conceded it. He never said a word to Motorola about this supposed interpretation. And moreover, and perhaps most importantly, we couldn't even cross-examine him on it because they claimed privilege over all his communications with his client. So if he thought something and, you know, even communicated it, there was no evidence of that whatsoever, except his testimony, which couldn't be tested for veracity. If he even thought this, it's got nothing to do with construing the release because he never said a word to Motorola. So all of this external, you know, evidence in terms of what some party might have described as environmental or not has got nothing to do with this release. I think the context comes from the negotiations, and there's a lot of record evidence of that from trial, and it comes from the words in the release itself. When you describe known environmental toxic torque claims as the valley claims, it follows a fortiori that the unknown claims are going to be similar. Let me turn for just a second to Zurich. Associated, there's a long history, and it's laid out in detail in our briefs. And so the court can fairly well see the development of the term environmental toxic torque and the development of the release as it came to be negotiated. As to Zurich, Zurich makes a point that it thought it got some sort of sudden, broad gift from Motorola. That is, that Motorola all of a sudden changed its negotiating position and handed Zurich a broader release. Well, there's no evidence to support that. In fact, there's evidence that shows the opposite. After the first failed negotiation with Zurich, what happened next? The Associated release gets negotiated and ultimately drafted and agreed to by the parties. Motorola then resumes its negotiations and discussions with Zurich. Right before those negotiations started, there was a settlement meeting in 2003. Right before that occurred, what happened? Motorola and Zurich exchanged through the mediator letters talking about what the current bidding was. In the letter, Motorola sends to Zurich, and again, this is an objective manifestation of intent. This is not what some person thought. This is what a person said. In the letter, Motorola sends to Zurich, it says that what they're proposing is an environmental release, and they send them a copy of the Associated agreement. It had been executed, and so they send it to Zurich, and they say, look, just for the sake of clarity, what we're willing to agree to is an environmental release. It involves the Valley claims, the 56 sites, and other unknown sites. Why is that important? Because it shows exactly what Motorola thought about the release, but more importantly, it shows what Zurich was told about the release. There's no letter back from Zurich where Zurich says, oh, we disagree with you. This is not an environmental release. It's a really broad release, and it encompasses all toxic torque claims. There's not one piece of correspondence that shows that. There's not one piece of testimony that that was ever made. What did Zurich do? It got the release. It agreed to it with Motorola's description of it as an environmental release, and all they did is negotiate over dollars, and it's very obvious what happened. $57 million recruitment claim over here, $41 million claim for endemic settlements and judgments over here. The parties slid toward the middle, and they did a walk-away. It's an environmental claims walk-away. They wanted to recoup their money for environmental claims. We wanted them to pay us for environmental claims. They met at zero. It was a walk-away. And what was the scope of the release? Environmental claims. We talked for just a few seconds. And those $2 amounts were originally based on the Valley litigation? Yes. $57 million was what Zurich had spent defending Valley, and essentially defense costs. There's a history there. Zurich filed for a judgment action. They were ordered by the trial court to defend the Valley claims, and it stayed the coverage cases, which is Illinois law. So they later asserted a recruitment claim, which the Illinois Supreme Court rejected. Okay, but they were framed by the Valley litigation. Exactly, framed by the Valley litigation. When you were negotiating the dollar amounts with Associated, what were those dollar amounts? Essentially the same thing. So there were different valuations over time, but the sort of bidding is laid out in our brief. Associated had done a valuation of what it believed its exposure was to Motorola's, basically, the Valley claims. To be honest, the insurers thought that Motorola's 56 other site claims were all barred by their policies. There's actually testimony at trial that they didn't take those seriously because they thought they were throwaways. And the truth is, the insurers were right. They had 56 sites. There were certain defenses that the insurers had asserted. Those were not the crux of the negotiations. The crux was always the Valley because those were out-of-pocket dollars, not theoretical dollars that might later erode. So those framed that. Associated had valued, and it's in the same October presentation that I referred to, Associated had valued the claims at a certain level. Motorola had valued them, not surprisingly, at a higher level. They had two primary policies that had a share of defense costs, and then there were settlements that spiked up through the primary limit up into their excess coverage. They had a $10 million excess coverage that sat right on top of their primary. And so Motorola said, well, look, we think we can get through your primary into the excess, and we think your exposure is bigger. You think it's smaller. And the parties basically negotiated a small payment by Associated. To believe that Associated is right, this court would have to conclude, or Judge Pierce would have had to conclude, that Motorola gave away all of its toxic tort coverage, save two small exceptions, that is for asbestos and products claims, for a few million dollars. This is tens of millions of dollars in coverage for all unknown future claims and an unlimited defense obligation. One of the wonderful things about CGL policies is they pay defense outside of limits. So they defend until the cows come home, until the policy is exhausted by settlements. And so the suggestion that Motorola gave all of this coverage away, when it had a valid, good claim against Associated, for the value litigation for a few million dollars, is just not correct. Briefly, to the Chris notebook. The history there is that, I described what the notebook is, it's just a collection of legal memos done by outside counsel for Motorola in 2006. The evidence is that it was prompted by IBM's semiconductor litigation. Plaintiffs brought litigation against IBM, asserting that they were damaged, just like the Clean Room claims, asserting that they were damaged, injured by exposure to toxins in Clean Rooms. That case was filed in the early 1990s. Motorola commissioned outside counsel to evaluate its exposure. So this is a collection of legal memos by Motorola's outside lawyers evaluating the IBM litigation. Motorola declined to produce it, because, of course, it's privileged. The insurers filed a motion to compel it. They argued relevance, they argued waste management. Judge Pierce, at our suggestion, we gave Judge Pierce the notebook in camera to review. It's a big, thick notebook, and their motion to compel was filed in October, not long before trial, which began in the first week of December. Judge Pierce reviewed the notebook, and it's on the record from the trial. He said, I've reviewed it, I don't believe it's relevant to any issue in this case. Well, was Judge Pierce in a good position to evaluate the relevance of that notebook? Absolutely. He made the ruling the day of trial. I mean, it was five minutes before I did the opening argument. He made that ruling at trial, with full knowledge of what the parties were arguing about the scope of the release. Each party had submitted very detailed trial briefs that outlined the legal issues and their trial proof. And so when Judge Pierce looked at the crisp notebook and determined that it wasn't relevant to settlement agreements, he was in an excellent position to do that. But setting all that aside, the insurers have no right to it anyway. They argue waste management. Well, waste management says that if you get privileged documents, it's because you're being asked to somehow defend or pay for the underlying litigation. This is an evaluation done by Motorola years before the cleanroom cases. Fifteen years before the cleanroom cases, or ten years before the cleanroom cases were filed. So even if they were theoretically entitled to get a privileged document from Motorola, from 10 or 12 years ago, because it was used for the defense effort, that's not what this was. There were no cleanroom claims for Zurich to defend. So what they want is a look back into Motorola's own internal work product and privileged information from more than a decade before they were asked to do anything with respect to the cleanroom claims. It's simply not something they can ever get under waste management, even if it were relevant, which Judge Pierce found it wasn't. I think we started with a question from you, from the court, as to whether or not we believe that the evidence, the manifest weight of the evidence supports the judgment. I think it certainly supports the trial judgment. Judge Pierce heard all the witnesses, saw all the exhibits, and he concluded that the insurers had not carried their burden. On summary judgment, I would submit that it's essentially the same analysis. There's a release that says environmental pollution, environmental contamination, and other injurious environmental conditions. The way the insurers go through that release, they basically read the word environmental out. It doesn't matter if it's in there or not, because they say the environment means anything, anywhere. They submit some dictionary definitions supporting that. The dictionary definitions resolve the standoff. I mean, Motorola's got definitions that support its view. The insurers have definitions that support their view. And you've got to stand on it. The hallmark of ambiguity is when a court looks at two competing interpretations of a clause and can't figure out who's right. That's exactly what happened with Judge Pierce. He didn't construe it against anyone. He looked at it right down the middle, and he decided it was unclear. And therefore, the insurers, who, again, bore the burden to prove that this applied, they got a trial. Unfortunately for them, they lost the trial because their evidence about what this meant didn't have it. I have a question with regards to the Columns case. Zurich and Associates indicate that Judge Pierce erred by looking and discussing the Columns case. In your briefs, you kind of don't weigh into that discussion. So are you just conceding that issue? Conceding is probably a little too strong. I think it's a sideshow. Okay. Judge Pierce, in his summary judgment opinion, and I'm sure the court has gone back and read it quite carefully, in his summary judgment opinion, Judge Pierce simply makes the points that in Columns, the court, the Illinois Supreme Court, has construed pollution exclusions to bar environmental, essentially traditional environmental claims. So there's a pollution exclusion, sudden release, discharge, escape, soot, contaminants, pollutants. And what Judge Pierce says, look, Motorola argues that I should look at the word environmental in that context. It's fairly obvious that while Judge Pierce heard our argument, because he refers to it in the summary judgment opinion, he didn't buy it. Because what he said is I'm considering this neutrally and not against any party. The only thing I think is worth referring to, and this goes back to a point that Mr. Merrick made, is that in the pollution exclusion, there are a lot of words used. You know, it's release, dispersal, discharge, escape. And then it goes on to define pollutants. And pollutants are things like soot, smoke, toxic chemicals, et cetera. When Judge Pierce said that some of the words used in the definition for environmental toxic tort are the same as in the pollution exclusion, that's what he's referring to. Associate omits those words in its brief. They have a really good little table that talks about release, discharge, dispersal, but they omit the rest of it, the definition of pollutants, which is soot, smoke, chemicals, et cetera. And so when Judge Pierce talks about pollens and why he viewed it relevant, at least in evaluating Motorola's argument, that's all he's talking about. Okay, thank you. Thank you. A couple minutes apiece there. We have another case. Let me try to be quick. As respects to pollens, please take a look at the language. It's much different. Judge Pierce was wrong. Okay, he was wrong. The pollens spoke in terms of releases, discharge, and the like. Here, the term that's selected by Motorola and presented to Zurich was exposure, a much broader term. Remember what I talked about in terms of the cup of water. Secondly, you don't hear anything from Motorola about the integration clause and about the Supreme Court's ruling in air safety. I won't quote what the court said, but take a look at page 465. At page 465, the Illinois Supreme Court made very clear when you have a contract with an integration clause, the parties have contracted not to look at the circumstances but to be construing their agreement on the four corners. That's what air safety says, and that's binding, of course, on this court. So the case is more simple. It starts with the four corners. Predictably, because the brief was written this way, this is the way the trials were, there is a lot of smoke coming from Motorola. There's a lot of smoke about what it believes the circumstances were and that type of thing. But the fact is, close to $100 million was issued between the parties, and what was offered to Zurich by Motorola was a broad release. Look, too, to what Judge Pierce said in the summary judgment ruling. He came very close to biding in the insurer's favor. He noted it was a broad release, noted it was broader than simply the valley litigation, noted that they were releasing unknown, unknowable, unforeseen claims. He made that point. But what I would suggest was a pretty close call. He said, you know, let's hear some evidence. Ultimately, when the evidence was heard, most of it, if not all of it, relevant to my client, was entirely irrelevant. Justice Rochford, you asked for the evidence which supports a manifest type of standard, our position. Let me give you just a quick rundown. The CRISP notebook used the word environmental. That's an admission on the part of Motorola. Two, the Zurich-Motorola course of dealing and performance demonstrate both knew before and after that Zurich regarded cleanroom claims, asbestos, cell phones, things of that nature as environmental. That's unrebutted. Motorola's internal investigation of its cleanroom exposure was handled by environmental attorneys. That's unrebutted. Motorola's form S-1 registration statement dated December 17, 2003 referred to cleanroom exposure as environmental. That's unrebutted. The unrebutted evidence of what the word means, and that's the focus, what does the word environmental mean in common parlance, shows unequivocally that environmental was intended and designed to include the cleanroom claims. So, Your Honors, that is the evidence. What was being negotiated or presumptions, and gee, did somebody want a broad release, did they get a narrow release, shouldn't be the focus, and, frankly, the law requires that you not make that the focus. Look to the four corners and you'll conclude that it is a very broad release like Judge Pierce found. It was admitted by Mr. Fortas at trial that it was a broader release than just a valid litigation. The rest is a sideshow, quite frankly, and both insurers are entitled to judgment as a matter of law. Thank you. Okay, I'm going to be succinct as I can be. I want to address a couple of questions that were asked. First, Your Honor, you asked about the preamble and the known claims, as Mr. Long talked about. That was a preamble. There was a couple of responses to that. No one disputes that the valid claims were known environmental claims, but the release extends well beyond the known ones. That's why you have a definition. Two, it's the law of this state that preamble clauses have no legal impact on the interpretation of a release. That's in the Rubinson v. Rubinson case from this court. And three, to address the point, they release not just that but unforeseen, unknowable claims. So to say that they were only releasing value-like claims flies directly in the face of the agreement. The point that the release is supposed to be construed against the benefit of the party, there's a case law that says that, but what Mr. Long omitted to say was this agreement has an express provision that it's not to be construed against either party. So that trumps that argument. As for columns, one additional point, the court, Judge Pierce found, that the release was virtually identical to a prototypical pollution exclusion. Well, the columns turned on the dispersal release language to find it to be outdoors as opposed to indoors. He was simply wrong. If that led him to find ambiguity, that was incorrect. So anyway, back to the starting point. All the evidence Mr. Long talked about, which happened before the agreement, it's nice, but it's irrelevant. Because the fact is that they agreed to what they agreed to. And that language, and not what they exchanged beforehand, not what they thought beforehand, is what governs. And it contains no words, not any, limited environment only to outdoor claims caused by a release. Minors are trying to write in. It makes no reference whatsoever to valley litigation, similar claims, or valley-led claims. Two is the fact of the carve-outs. Mr. Long didn't talk about the carve-outs. But the fact is that they are carve-outs. Their own trial witnesses, Ms. Massey and Mr. Campbell, described them as carve-outs from the definition. So you don't need to carve something out from a definition that would otherwise be part of the definition. For instance, the asbestos indoor environment claims. Why is that so important? Because it eviscerates the argument that the release as written doesn't include indoor environment claims. So the bottom line is that their argument, I agree with Mr. Merritt, is premised on two things. Writing into the release words that aren't there, and that's precluded by the law of the state. In fact, it's precluded by a decision that Justice Hall, you wrote in the Mount Holly case. Justice Hall. I'm sorry. The 13th case. And they also want to excise the portions of the release, the carve-outs, that they don't like. That's the one you wrote in the Howard Hoffman case. So you get down to the reason the court should reverse it is because of this. The release fits the cleaning cases like a glove. It has carve-outs which prove that it includes indoor environment toxic torts. And they, in fact, both in the CRISP notebook and in their environmental health and safety documents, which were part of the record, refer to clean rooms as environments and clean room claims as environmental. That was even an SEC filing they made in 2003. So for all those reasons, the law is on our side. That's the facts. Thank you. Okay. Thank you. So you're pounding both, right? Pounding both. Thank you. Thank you. Thank you. It'll be a short recess.